## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

YULON WIMBUSH,

     Plaintiff,

     v.

KAISER FOUNDATION HEALTH PLAN
OF THE MID-ATLANTIC STATES, INC.,
*d/b/a Kaiser Permanente*,

     Defendant.

Civil Action No. TDC-14-0525

## MEMORANDUM OPINION

Plaintiff Yulon Wimbush has filed suit against Defendant Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc. ("Kaiser"), alleging sex and race discrimination, including through a hostile work environment, and unlawful retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.* (2012), and the Maryland Fair Employment Practices Act ( "FEPA"), Md. Code Ann., State Gov't §§ 20-601 *et seq.* (2015), as well as violations of the Family Medical Leave Act ( "FMLA"), 29 U.S.C. §§ 2601 *et seq.* (2012). Pending before the Court is Kaiser's Motion for Summary Judgment. The Court held a hearing on the Motion on February 19, 2016. For the reasons set forth below, the Motion is GRANTED IN PART and DENIED IN PART.

## BACKGROUND

The following facts are presented in the light most favorable to Wimbush, the nonmoving party:

## I.      Employment at the Fair Oaks Call Center

In October 2009, Wimbush, an African American woman, began working for Kaiser as a Teleservice Representative at its Fair Oaks, Virginia Call Center.  Wimbush's duties included fielding calls from Kaiser's members and scheduling medical appointments.

After her initial training, Wimbush was supervised by Christopher Veney.  In July 2010, without apparent reason, Veney began to make sexually charged comments to Wimbush.  The first incident occurred when Veney and Wimbush were alone in a room with the door closed discussing Wimbush's work.  Veney told Wimbush that she was "sexy," "looking good," and "dressed nice."  Def.'s Mem. Supp. Summ. J. ("Mem.") Ex. 1, Wimbush Dep. at 113:8–115:12. Wimbush asked Veney to stop making such comments because they made her uncomfortable. Wimbush did not immediately report the incident to Kaiser, but sometime in early August she told Margaret Hogue, the president of Wimbush's union, the Office and Professional Employees International Union Local 2 ("Local 2").[1]

On another occasion, Veney approached Wimbush in the Call Center and said that he could "put his dick in [her] nose."  Pl.'s Opp'n Mot. Summ J. ("Opp'n") Ex. 2, Wimbush Decl. ¶ 8.  Soon after, Wimbush was walking in the Call Center when Veney remarked, "[I]t looks like your man is fucking you right."  Wimbush Dep. at 131:8–132:5.  In the same time frame, Veney regularly talked about her "titties" and at one point told her that her "titties" were "hanging out." Wimbush Decl. ¶¶ 6-8; Opp'n Ex. 5, Gibson Decl. ¶ 8.  Later, Veney stood behind Wimbush

---

[1]   Wimbush attached a declaration to her Memorandum in Opposition to the Motion that Kaiser characterizes as a sham affidavit.  To the extent that certain statements in Wimbush's declaration directly contradict her deposition testimony and Wimbush has not provided a reasonable explanation for those contradictions, the Court does not consider them.  *See Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806-07 (1999).  Such statements include Wimbush's statement in her declaration that she contacted Margaret Hogue "immediately" after Veney made his first inappropriate comment.  *Compare* Pl.'s Opp'n Mot. Summ J. Ex. 2, Wimbush Decl. ¶ 7 *with* Wimbush Dep. at 112:13-15, 121:14-122:7.

while she was on the phone with a Kaiser patient and said something about her "big breast," though Wimbush did not hear the entire statement.  Wimbush Dep. at 137:2–143:3, 146:16–148:1.  Veney also used to stand behind Wimbush and attempt to look down her shirt.

These incidents caused Wimbush a great deal of anxiety.  She felt "badger[ed]" and "bullied" by Veney.  *Id.* at 135:7-11.  After her initial complaint to Hogue, Wimbush did not tell anyone else about Veney's behavior.  Wimbush believed that Kaiser had failed to act on complaints by others about Veney's workplace behavior, such as berating and swearing at female employees, so she feared losing her job and not being able to support her family if she spoke out.

Two of Wimbush's co-workers, Tiffany Gibson and Sharlie Kazadi, overheard some of Veney's remarks to Wimbush, including the comments that it "looks like your man is fucking you right."  In early August 2010, they brought separate complaints to Veney's supervisor, Marianne Rigo.  Gibson followed up by reporting Veney's sexually explicit comments to Human Resources two weeks later.  After Gibson told Rigo about Veney's repeated, explicit comments about Wimbush's breasts and the "dick in your nose" comment, Rigo met with Wimbush, but Wimbush did not feel comfortable discussing the situation without a union official present.  Wimbush broke down crying and was allowed to go home on administrative leave.

Once Veney learned of Wimbush's accusations, he began to react negatively toward Wimbush.  He rolled his eyes and snarled at her in the Call Center.  He filed corrective actions against her that she believed to be false, though they did not have an impact on her employment.  At one point, Veney threw a stack of papers on Wimbush's desk.  Veney's efforts to intimidate Wimbush caused her a great deal of stress, at one point inducing a panic attack that required emergency medical attention.

On August 30, 2010, at a meeting with Rigo and union shop steward Kendra Bobitski, Wimbush described Veney's behavior, indicated that she was afraid of him, and requested that he be removed as her supervisor. Rigo refused. Wimbush then took the next three work days off as unpaid leave. On September 7, 2010, Wimbush, Rigo, and Bobitski met again, this time with "Kaiser upper management" also in attendance. Wimbush Decl. ¶ 15. Wimbush again described Veney's behavior, again asked to be removed from his supervision, and again was denied.

Kaiser's version of these meetings departs from Wimbush's in several respects. Rigo and Bobitski state that they met with Wimbush twice on August 27, 2010. In the first meeting, they allege, Wimbush asked to be removed from Veney's team because he used a disrespectful tone with her, had given her a poor job reference, and changed her seat in the Call Center. Later that day, with Bobitski and Gibson present, Wimbush told Rigo that Veney had made a comment about her use of nasal sticks, stared at her chest, and had told another employee, "You look fine. Your man must be treating you right." Mem. Ex. 5, Rigo Decl. ¶ 7; *id.* Ex. 6, Bobitski Decl. ¶ 4. Rigo questioned Veney, who denied the allegations and attributed Wimbush's complaint to a corrective action he had taken against Wimbush that morning.

Rigo asserts that she, Bobitski, Wimbush, and Veney then met on September 8. Although Rigo acknowledges that Wimbush reported at that meeting that when she had a Vicks vapor stick in her nose, Veney had said, "Dick in your nose, titties hanging out," Veney denied doing so. Rigo concluded that Wimbush would remain under Veney's supervision. However, Rigo assured Wimbush that she would have no more one-on-one in-person interactions with Veney because Veney would have to ask Rigo, Bobitski, or a Kaiser manager to be present when communicating with Wimbush. Rigo also promised to set up a system on Wimbush's phone

enabling her to seek assistance from supervisors other than Veney.  Wimbush denies that Rigo offered or implemented these measures.

Not satisfied with the September 8 meeting, Wimbush filed a complaint about Veney with Kaiser's Human Resources and Compliance Departments that same day.  Director of Compliance Lisa Adkins opened an investigation.  Also on September 8, Wimbush took extended medical leave, during which she sought treatment for anxiety related to Veney's harassment.

When Wimbush returned to work on October 11, she believed that Veney was still her supervisor and still attempting to intimidate her.  Kaiser contends that Wimbush was moved off of Veney's team while the Compliance Department's investigation was pending.  On October 16, having seen Veney "snarling and rolling his eyes" at her, Wimbush went out again on medical leave and never returned to work at the Fair Oaks Call Center.  Wimbush Dep. at 214:4-5.

On November 9, 2010, Adkins issued her report on the compliance investigation. Although she found that there were two co-workers in addition to Wimbush who heard Veney make sexually inappropriate comments to Wimbush, and she had received reports that Veney had inappropriately touched a different co-worker and was rumored to have been romantically involved with co-workers, she determined that her investigation into Wimbush's allegations of sexual harassment had been inconclusive.  She recommended, however, that Veney receive sexual harassment training.  According to Veney, he was not actually required to undergo sexual harassment training after the Wimbush investigation concluded.

## II.    Employment at the Gaithersburg Medical Center

After leaving the Fair Oaks Call Center, Wimbush participated in a transitional work program, then moved to a Kaiser facility in Shady Grove, Maryland, before starting work in

March 2012 as a receptionist at Kaiser's Gaithersburg Medical Center in Gaithersburg, Maryland.  Wimbush typically worked on the third floor of the six-floor facility, answering the phone and assisting members who had called or come to the facility for medical appointments.

Wimbush and 12 other receptionists were supervised by the Medical Center Administrative Director, Katherine Butler, a white woman.  Butler treated Wimbush respectfully at first, but various conflicts arose once Wimbush became a shop steward for Local 2 in May 2012.

### A.    Scheduling Disputes

After Wimbush became a shop steward, Butler would not allow her to take time to attend to union duties, such as meeting with employees about their issues with management, sometimes in different parts of the facility.  She also started to ignore or deny Wimbush's requests for time off.  For instance, on or about December 12, 2012, Wimbush unexpectedly needed to miss a day of work to take care of a sick child.  Wimbush attempted to follow the after-hours call-out procedure designated by Butler, but was unsuccessful.  Wimbush then called Butler directly. Butler responded that "taking care of you[r] 14 year old son can be as simple as seeing that he has what he needs" and instructed Wimbush to come into work.  Mem. Ex. 8, Butler Decl. Ex. 1, Dec. 13, 2012 Emails at 1.

Wimbush also believed that, although two receptionists could work at the same desk, Butler unfairly refused to assign a second receptionist to work at her desk or the desks of other black receptionists.  White receptionists, on the other hand, were more often paired up, allowing them to share their workload.  Butler claims that she staffed reception desks according to the volume of work anticipated for each floor without regard to the race of the receptionists. Wimbush was very busy but does not know whether other floors were busier than hers.

In June 2013, Butler attempted to reassign Wimbush from a shift that started at 8:00 a.m. to a shift that started at 9:00 a.m.   Butler explained that Wimbush's frequent tardiness was causing problems for the departments she served.   Butler planned to give Wimbush's shift to a non-African American employee with less seniority.   Wimbush filed a grievance with the union, and the change never went into effect.

### B.      Physical Therapy Aide Position

In August 2012, Kaiser posted a position for a physical therapy aide at the Gaithersburg Medical Center.   Wimbush applied, and on November 12, 2012, Melissa Reinhardt, supervisor for the physical therapy department at Gaithersburg, interviewed Wimbush for the job. Wimbush asserts that during the interview, Reinhardt said that she wanted to offer Wimbush the job, but that Reinhardt would need to speak to Wimbush's supervisor first.   Reinhardt instructed Wimbush to contact Human Resources to confirm the position's salary.

Sometime after interviewing Wimbush, Reinhardt spoke to Butler about Wimbush's work history and asked her about Wimbush's time and attendance.   Neither Reinhardt nor Butler provides a date for this conversation, though both remember it taking place in the administration area of the Gaithersburg Medical Center.   Butler recalls the conversation occurring at about 7:30 a.m.   Butler later acknowledged to Wimbush that during the conversation, she told Reinhardt that Wimbush used FMLA leave "a lot."   Wimbush Dep. at 265:12–266:3.   Butler claims she volunteered that Wimbush had used FMLA leave to ease Reinhardt's concerns about Wimbush's attendance record, which might otherwise suggest that Wimbush took leave without notice or justification.   Butler testified that she encouraged Reinhardt to select Wimbush for the position. Reinhardt has denied that the discussion about FMLA affected her decision but has

acknowledged that FMLA would affect an employee's time and attendance, and that absences are a consideration in the hiring process.

Wimbush emailed Reinhardt on November 23 to thank her for the interview and tell her that she checked with Human Resources and found the salary to be acceptable. Reinhardt responded three days later and informed Wimbush that she had hired an applicant with more experience.

According to Reinhardt, she never told Wimbush that she was going to offer her the job. Reinhardt claims that she only interviewed Wimbush because Human Resources refused to approve the employee Reinhardt selected for the job until Reinhardt interviewed Wimbush, the qualified applicant with the most seniority. Reinhardt further asserts that after interviewing Wimbush, the same day, she told Human Resources that she wanted to hire her original selection, who had prior experience as a physical therapy aide.

### C.    Jessica Station's Complaint

In May or June 2013, in her role as a union shop steward, Wimbush sought to assist fellow receptionist Jessica Station resolve issues with Butler. In March 2013, D'Jai Christie, an African American receptionist, had told Butler that a patient had complained about an odor coming from Station. Butler met with Station, who is African American, to have "an awkward discussion" about the complaint. Butler Decl. ¶ 6. Upset, Station confided in Wimbush, her shop steward. Wimbush, in turn, informed head shop steward Sandy Smith, who discussed the matter with Butler. Sometime in May or June, Wimbush and Station met with Butler. Butler tried to exclude Wimbush from the meeting, but Station insisted that Wimbush accompany her. In the meeting, Wimbush discussed why Station felt that Butler was treating her unfairly and in a racist manner. They also discussed alleged problems with Station's odor and time and

attendance, and Butler told Station that she needed to make a "transformation."  Wimbush Dep. at 297:15-21, 299:3-6.

At some point after that meeting, Station told Wimbush that she believed Butler to be racist.  As evidence, Station pointed to Butler's handling of the odor complaint, her comment about a "transformation," and her apparent practice, which Wimbush also perceived, of pairing up white receptionists more frequently than black receptionists with the result that the African American receptionists had significantly more work.  Station also referenced that a white receptionist always seemed to report her when she left her desk, even for a brief period of time, a complaint which Wimbush connected to an incident when Butler had called Wimbush to ask why Station was not at her desk.

 In July, Wimbush and Station sought to meet with Butler again to discuss issues unresolved in the previous meeting, including Station's concerns about race discrimination, but Butler avoided the meeting.  According to Wimbush, she then informed Smith, as head shop steward, about Station's continuing concerns, including her allegation of race discrimination.  Smith denies that Wimbush mentioned race discrimination to her.  Wimbush also contacted Mike Cowan, a Local 2 union officer, and Jackie Sayan of Kaiser's Human Resources department to report the same issues, but she provided fewer details to Sayan because she was not a member of Local 2.

### D.      Wimbush's Termination

On July 25, 2013, Christie, the same receptionist who had reported the patient's complaint about Station's odor, informed Butler that she had heard from other employees that Station and Wimbush had called Butler a racist.  In addition to participating in the discussion with Wimbush and Station, Butler had also recently attempted to change Wimbush's shift.

Butler requested an investigation and sought to file a formal complaint against Wimbush and Station.  Compliance Manager Joyce Adams led the investigation.

Adams interviewed Butler, Station, Wimbush, and Christie, as well as receptionists Juanita Witherspoon, Kathia Myles, and Kaneesha Benjamin, and a facilities employee not supervised by Butler named Ron Donaldson.  She summarized these interviews in a report (the "Adams Report").  During the interviews, Witherspoon, Christie, and Myles expressed their views that Butler is not racist.  Benjamin stated that Butler is unfair, but acknowledged that "she has not observed Butler behaving in a racist manner."  Mem. Ex. 12, Campbell Decl. Ex. 1, Adams Report at 6-7.  Of these receptionists, Witherspoon was the only witness who claimed to have heard Station call Butler a racist.  Benjamin was the only one who remembered hearing Wimbush call Butler a racist.

When asked if she had said that Butler was racist, Station stated that she had made such statements to Wimbush, her shop steward.  She said that she believes that Butler discriminates by being stricter with African American employees regarding the attendance policy than with other employees.  She also stated that Donaldson had told her that Butler shows favoritism to white people and is racist.

Donaldson denied making any statements about Butler, but acknowledged that he had heard from Wimbush, Station, Benjamin, and Myles on different occasions that Butler was racist or showed favoritism.  Specifically, he heard that Butler "shows favoritism toward white employees and is demeaning and condescending toward African American employees."  *Id.* at 3.

When interviewed, Wimbush denied calling Butler racist.  She stated that, in her role as shop steward, employees had come to her to express concerns about racism, but she declined to identify those employees.  Wimbush stated that she conveyed the concerns about racism to Head

Shop Steward Sandy Smith.  According to the Adams Report, Smith stated that Wimbush had brought her concerns about Butler's application of the time and attendance policy, but not about racist behavior.  Wimbush also noted that "nothing is said to Caucasian females" about issues, but she would not further discuss those issues out of fear of losing her job.  *Id.* at 6.  She added that she had advised someone to contact Compliance and now believed that she was being retaliated against.

Based on these interviews, Adams concluded that Station and Wimbush had spread a false rumor that Butler was racist and recommended "appropriate remedial steps."  *Id.* at 7.

On September 3, 2013, Adams sent the report to Gary Campbell, Director for Critical Care Hospital Services for DC/Suburban Maryland.  After reviewing the report, Campbell consulted Charlene Yates from Kaiser's Human Resources Department and Michelle Behzadi, Area Administrator for DC/Suburban Maryland.  He then decided to terminate Wimbush.  Campbell informed Wimbush of his decision at a meeting on September 10, 2013.  Wimbush asserts that Campbell told her that firing such an exemplary employee made him sick to his stomach.  Wimbush protested that Butler had been unfair in her scheduling decisions.  Campbell claims that, when he fired Wimbush, he had no knowledge of any efforts that she had made to complain about or oppose racial discrimination at Kaiser.

## III.    Procedural History

The United States Equal Employment Opportunity Commission ("EEOC") provided Wimbush with right-to-sue letters for her race discrimination claims and sex discrimination claims on November 26, 2013 and June 10, 2014, respectively.  Wimbush filed a Complaint against Kaiser on February 24, 2014, alleging race discrimination under Title VII.  On October 6, 2014, she filed an Amended Complaint, alleging multiple violations of Title VII and adding

FMLA, FEPA, and other state law claims.  On May 5, 2015, the Court granted in part Kaiser's Motion to Dismiss and dismissed all of Wimbush's state law claims except for her FEPA claim. On May 8, 2015, Wimbush filed a Second Amended Complaint, which corrected deficiencies in the jurisdictional allegations identified by the Court's Order on the Motion to Dismiss.  On May 18, 2015, Kaiser filed a Motion for Reconsideration of the ruling on the Motion to Dismiss.  On June 16, 2015, Kaiser filed the pending Motion for Summary Judgment.  On July 17, 2015, Wimbush submitted an Opposition to the Motion for Summary Judgment.  On August 13, 2015, Kaiser filed a Reply.   On November 18, 2015, the Court denied Kaiser's Motion for Reconsideration.

## DISCUSSION

### I.     Legal Standard

Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the moving party demonstrates there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  The Court may rely only on facts supported in the record, not simply assertions in the pleadings.  *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003).  The nonmoving party has the burden to show a genuine dispute on a material fact.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.  A dispute of material fact is only "genuine" if

sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party.  *Id.* at 248-49.

## II.    Exhaustion of Administrative Remedies

In its Motion, Kaiser repeats the arguments made in its Motion for Reconsideration that the Court lacks subject matter jurisdiction over Wimbush's race discrimination and retaliatory discharge claims because Wimbush failed adequately to exhaust administrative remedies.  These arguments fail for the reasons stated in the Court's prior Order denying the Motion for Reconsideration.

At oral argument, Kaiser noted that the Court's ruling on the Motion for Reconsideration did not address the merits of one aspect of its exhaustion argument, that Wimbush did not verify her EEOC charge.  The Court had denied that claim on the ground that it was raised for the first time in a reply memorandum and thus was waived.  Here, too, Kaiser raised the claim that the lack of verification warrants dismissal for the first time in its Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment, so it ordinarily would be waived.  *See United States v. Williams*, 445 F.3d 724, 736 n.6 (4th Cir. 2006); *Clawson v. FedEx Ground Packages Sys., Inc.*, 451 F. Supp. 2d 731, 734-35 (D. Md. 2006).  Nevertheless, Kaiser argues that because administrative exhaustion is a jurisdictional matter, the Court must address the issue.  Because questions of subject matter jurisdiction concern the court's power to hear the case, they must be resolved before the court can turn to the sufficiency or merits of a claim.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998).  The Court therefore addresses whether Title VII's verification requirement is jurisdictional.

Before filing suit under Title VII, a plaintiff must file an administrative charge of discrimination with the EEOC.  42 U.S.C. § 2000e-5(f)(1).  "Charges shall be in writing under

oath or affirmation." *Id.* § 2000e-5(b).   EEOC regulations repeat the statute's mandate:   "a charge shall be in writing and signed and shall be verified."   29 C.F.R. § 1601.9 (2015). "Verified" means "sworn to or affirmed before a notary public, designated representative of the [EEOC], or other person duly authorized by law to administer oaths and take acknowledgments, or supported by an unsworn declaration in writing under penalty of perjury." *Id.* § 1601.3(a).   It is undisputed that Wimbush did not verify her EEOC charge relating to race discrimination and retaliatory discharge.

In *Balazs v. Liebenthal*, 32 F.3d 151 (4th Cir. 1994), the United States Court of Appeals for the Fourth Circuit observed that "the filing of a sworn charge of discrimination with the EEOC is a mandatory prerequisite to the validity of the charge" and that the failure to file a verified charge is "fatal" to a Title VII claim. *Id.* at 156.  *Balazs* held that a Title VII plaintiff could not cure his failure to verify a charge after he had already filed suit. *Id.* at 157-58.  It did not directly address whether the verification requirement is jurisdictional, or whether the requirement is subject to waiver, and no subsequent decision from the United States Supreme Court or the Fourth Circuit has answered these questions.  However, the United States Courts of Appeals for the Third, Fifth, and Tenth Circuits have all held that the verification requirement is not jurisdictional.  *Gad v. Kan. State Univ.*, 787 F.3d 1032, 1038-41 (10th Cir. 2015); *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 262-63 (3d Cir. 2006); *Price v. Sw. Bell Tel. Co.*, 687 F.2d 74, 78-79 (5th Cir. 1982); *see also Farley v. Goodwill Indus. of Lower S.C., Inc.*, No. 15-2450, 2016 WL 408949, at *11-13 (D.S.C. Jan. 12, 2016) (finding that *Balazs* did not address whether the verification requirement is jurisdictional and holding based on *Gad* that it is nonjurisdictional), *report and recommendation adopted*, No. 15-2450, 2016 WL 398159 (D.S.C. Feb. 2, 2016).

The Court's analysis starts with the general principle that "when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character." *Arbaugh v. Y & H Corp.*, 546 U.S. 516, 515 (2006).  Title VII does not denominate verification as a jurisdictional requirement.  The statute's jurisdictional provision, 42 U.S.C. § 2000e-5(f)(3), makes no reference to verification, and the verification provision, *id.* § 2000e-5(b), makes no reference to jurisdiction.

The verification provision therefore occupies a position in the statutory scheme similar to that of two other nonjurisdictional requirements:  that a plaintiff file a charge of discrimination within 180 days of the alleged unlawful employment practice and that the defendant have at least 15 employees.  42 U.S.C. §§ 2000e-5(e)(1), 2000e(b), 2000e-2(a)(1).  The Supreme Court has held that these two requirements are not jurisdictional because, like the verification requirement, they appear in statutory provisions that do not "speak in jurisdictional terms or refer in any way to the jurisdiction of the district courts."  *Arbaugh*, 546 U.S. at 515 (15-employee requirement); *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 394 (1982) (180-day time limit).

The Supreme Court has also instructed that, when interpreting Title VII generally and the verification requirement in particular, courts must be mindful of the fact that Congress created "a remedial scheme in which laypersons, rather than lawyers, are expected to initiate the process." *Edelman v. Lynchburg Coll.*, 535 U.S. 106, 115 (2002) (quoting *EEOC v. Commercial Office Prods. Co.*, 486 U.S. 107, 124 (1988)).  The verification requirement should be construed so that "the lay complainant, who may not know enough to verify on filing, will not risk forfeiting his rights inadvertently."  *Id.*; *see also Zipes*, 455 U.S. at 397 (noting that "a technical reading [of the timely filing requirement] would be 'particularly inappropriate in a statutory scheme in which laymen, unassisted by trained lawyers, initiate the process'") (quoting *Love v. Pullman Co.*, 404

U.S. 522, 527 (1972)).   The facts of this case illustrate how a jurisdictional verification requirement would create a severe risk of a lay complainant forfeiting rights inadvertently.   Here, Wimbush initiated her complaints of race discrimination and retaliatory discharge by submitting an intake questionnaire to the EEOC.   The EEOC did not provide her a formal charge to sign and verify; the EEOC instead converted the intake questionnaire into a charge and issued Wimbush a right-to-sue letter, without ever informing Wimbush in any way that she was required to verify her charge.

In holding that the verification requirement is not jurisdictional, the Third and Tenth Circuits specifically relied on these interpretive principles outlined by the Supreme Court and the similar position in the statutory scheme shared by the verification requirement and other nonjurisdictional preconditions to suit.   *See Buck*, 452 F.3d at 262-64; *Gad*, 787 F.3d at 1038-39. Based on these principles and the weight of authority from the United States Courts of Appeals, the Court finds that Title VII's verified charge requirement is not jurisdictional.   As a result, Wimbush's failure to verify her charge does not deprive the Court of subject matter jurisdiction. Accordingly, consistent with its earlier ruling on the Motion for Reconsideration, the Court need not address on this Motion Kaiser's argument relating to the verification requirement, which was raised for the first time in a Reply Memorandum and thus without providing Wimbush an opportunity to respond.[2]   *See Williams*, 445 F.3d at 736 n.6.

---

[2]   Courts finding that the verification requirement is nonjurisdictional have found it is subject to waiver by either the defendant or the EEOC.   *Gad*, 787 F.3d at 1041-43; *Buck*, 452 F.3d at 264-65; *Price*, 687 F.2d at 79; *Farley*, 2016 WL 408949, at *11-13 (finding verification requirement waived where plaintiff did not sign and return an EEOC-drafted charge containing factual errors about her allegations of discrimination).   *Cf. Zipes*, 455 U.S. at 393 (noting that, because the timely filing requirement is not jurisdictional, it "is subject to waiver, estoppel, and equitable tolling").

### III.     Hostile Work Environment Claims

Wimbush claims that her Kaiser supervisors at Fair Oaks and Gaithersburg subjected her to hostile work environments in violation of Title VII, which prohibits employers from discriminating against individuals with respect to "terms, conditions, or privileges of employment, because of such individual's race . . . [or] sex[.]"  42 U.S.C. § 2000e–2(a)(1). "Since an employee's work environment is a term or condition of employment, Title VII creates a hostile working environment cause of action."  *EEOC v. R & R Ventures*, 244 F.3d 334, 338 (4th Cir. 2001).   A hostile work environment exists "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment."  *Boyer-Liberto v. Fontainebleu Corp.*, 786 F.3d 264, 277 (4th Cir. 2015).

A hostile work environment claim requires the plaintiff to prove that the offending behavior was (1) unwelcome, (2) based on gender or race, (3) "sufficiently severe or pervasive to alter the conditions of her employment and create an abusive atmosphere," and (4) imputable to the employer.   *Walker v. Mod-U-Kraf Homes, LLC*, 775 F.3d 202, 207-08 (4th Cir. 2014) (quoting *EEOC v. Cent. Wholesalers, Inc.*, 573 F.3d 167, 175 (4th Cir. 2009)).   If the harassment was perpetrated by the plaintiff's supervisor and that harassment culminated in a "tangible employment action," then the employer is vicariously liable.   *Crockett v. Mission Hosp., Inc.*, 717 F.3d 348, 354 (4th Cir. 2013).   If, however, the harassment did not result in a tangible employment action, then the employer may assert an affirmative defense to avoid liability.   *Id.* To prevail on such a defense, the employer must prove (1) that it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior"; and (2) the plaintiff "unreasonably failed to take advantage of any preventive or corrective opportunities provided by

the employer or to avoid harm otherwise." *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998).

### A.    Hostile Work Environment at Fair Oaks

Wimbush claims that Veney created a hostile work environment at the Fair Oaks Call Center through his sexually explicit comments and behavior. When viewed in the light most favorable to Wimbush, the evidence establishes that Veney's comments and behavior were unwelcome and directed at Wimbush because of her gender. Kaiser, however, asserts that Veney's conduct was not sufficiently severe or pervasive to constitute actionable employment discrimination.

### 1.    Severe or Pervasive Harassment

To prove that she endured severe or pervasive harassment, Wimbush must show both (1) that she subjectively perceived her work environment to be abusive or hostile; and (2) that a reasonable person in her position would have as well. *Walker*, 775 F.3d at 208. Wimbush satisfies the subjective component of this element through her testimony that Veney's behavior made her feel uncomfortable, badgered, bullied, and eventually fearful.

In deciding whether a supervisor's harassment is objectively severe or pervasive, courts look "at all the circumstances, which may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Boyer-Liberto*, 786 F.3d at 277 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)) (internal quotation marks omitted). "[W]hether 'harassment was sufficiently severe or pervasive is quintessentially a question of fact.'" *Walker*, 775 F.3d at 208 (quoting *Hartsell v. Duplex Prods., Inc.*, 123 F.3d 766, 773 (4th Cir. 1997)). The conduct need not involve physical touching or be physically

threatening to be actionable; conduct that is "humiliating and demeaning" or that paints women in a "sexually subservient and demeaning light" may be sufficient to meet this standard. *Id.* at 209-10 (quoting *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 334-35 (4th Cir. 2011), and *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 333 (4th Cir. 2003) (en banc)).

Veney's statements were more than merely offensive, were certainly humiliating and demeaning, and bordered on physically threatening. The Fourth Circuit has held that multiple sexually explicit references to women in general can be sufficiently severe and pervasive to establish a hostile work environment. *See Hoyle v. Freightliner, LLC*, 650 F.3d 321, 331-34 (4th Cir. 2011) (holding that co-workers' display of pictures of nude and scantily clad women as well as their placement of a tampon in the plaintiff's workspace were sufficiently severe or pervasive to satisfy this element on summary judgment). Here, Veney went well beyond such conduct by addressing his sexually explicit remarks to Wimbush as an individual, commenting on her appearance, her breasts, and her sex life in a manner that a reasonable person would have found humiliating and demeaning. *See Walker*, 775 F.3d at 205, 209-10 (denying summary judgment where co-workers made repeated, inappropriate sex-based comments, including calling the plaintiff "fresh meat," grabbing their crotches, and suggesting oral sex); *cf. Jennings v. Univ. of N.C.*, 482 F.3d 686, 696 (4th Cir. 2007) (en banc) (holding under a parallel standard for hostile environment under Title IX of the Civil Rights Act that a soccer coach's repeated inquiries into his players' sex lives and comments on their bodies were sufficiently severe and pervasive to defeat a motion for summary judgment). The fact that the comments not only related specifically to Wimbush, but that they even described sexually explicit activity that Veney might engage in with Wimbush, such as the reference to putting a "dick in your nose," takes his conduct well beyond the general sexually suggestive activity present in *Hoyle*.

Moreover, although harassment by co-workers, as in *Hoyle* and *Walker*, may be actionable, the severity of Veney's conduct is exacerbated by the fact that he exercised authority over Wimbush in the workplace.   He could initiate disciplinary actions and review her performance.   His status as Wimbush's supervisor "invests his . . . harassing conduct with a particular threatening character."   *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 763 (1998). As a supervisor, he also harassed her while she was in vulnerable positions:   Veney made his first inappropriate comment to Wimbush, that she was sexy and good looking, when they were alone together in a closed room discussing her work.   Although Wimbush asked him to stop, his behavior became more aggressive, progressing to commenting about her breasts and stating that "your man must be fucking you right."

Veney's behavior did more than inconvenience Wimbush.   The stress induced by his conduct impaired Wimbush's ability to do her job to such an extent that she had to take medical leave for several weeks.   The conduct described by Wimbush is not among "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing."   *Faragher*, 524 U.S. at 788 (internal quotation marks omitted).

Kaiser compares this case to two unpublished district court cases, *Sraver v. Surgical Monitoring Services, Inc.*, No. 05-1331, 2006 WL 2190727 (D. Md. July 27, 2006), and *Freire v. Keystone Title Settlement Services, Inc.*, No. 08-2976, 2009 WL 5217033 (D. Md. Dec. 30, 2009), in which the courts granted summary judgment to employers on hostile work environment sexual harassment claims.   Not only do these cases pre-date the Fourth Circuit's rulings in *Hoyle* and *Walker*, but key factual differences diminish the persuasive power of those opinions.   Unlike Veney's comments, which were directed solely at Wimbush, many of the sexually explicit comments at issue in *Sraver* were made to multiple employees, thus diluting their abusive

character. *Sraver*, 2006 WL 2190727, at *5. In neither case was there any statement that could be construed as threatening to physically assault the plaintiff, such as Veney's statement that he would like to put his "dick in your nose." *Id.*; *Freire*, 2009 WL 5217033, at *5. In addition, both *Sraver* and *Freire* concluded that the plaintiffs had failed to present evidence that the harassment unreasonably interfered with their work. *Sraver*, 2006 WL 2190727, at *5; *Freire*, 2009 WL 5217033, at *5. By contrast, Veney's harassment was so severe that Wimbush was unable to work for several weeks. Mindful that this prong of the *prima facie* case is "quintessentially a question of fact," *Walker*, 775 F.3d at 208, the Court cannot find as a matter of law that the harassment described by Wimbush is not sufficiently severe or pervasive to allow a reasonable jury to find a hostile work environment.

### 2. Imputable to the Employer

Because Wimbush's claim is based on the actions of her supervisor, the sexual harassment would generally be imputable to Kaiser. *Crockett*, 717 F.3d at 354. However, if the hostile work environment did not result in a "tangible employment action," an employer may avoid liability by establishing an affirmative defense that (1) it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior"; and that (2) the plaintiff "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher*, 524 U.S. at 807.

Here, Kaiser can mount an affirmative defense because Veney's harassment did not culminate in a tangible employment action. "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in

benefits." *Ellerth*, 524 U.S. at 761.  It is "an official act of the enterprise" taken by a supervisor, and it typically "inflicts direct economic harm." *Id.* at 762.

Wimbush argues that unfounded corrective actions, allegedly filed against her by Veney and Kaiser management in retaliation for her complaints of sexual harassment, amount to a tangible employment action.  Wimbush acknowledges, however, that any such corrective actions were removed from her file, and she does not identify any consequences, economic or otherwise, resulting from these actions.  Corrective actions with no effect on her employment status would not constitute tangible employment actions.  *See Crockett* at 356 (finding no tangible employment action where plaintiff failed to show that suspension without pay led to pecuniary loss); *Whitten v. Fred's, Inc.*, 601 F.3d 231, 247 (4th Cir. 2010) (holding that changes to the plaintiff's work schedule, unpleasant assignments, and verbal and physical abuse did not constitute tangible employment actions), *abrogated on other grounds by Vance v. Ball State Univ.*, 133 S. Ct. 2434 (2013).  Kaiser may proceed with its affirmative defense.

In order to establish the affirmative defense, Kaiser must first show that it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior." *Faragher*, 524 U.S. at 807.  At the time, Kaiser had an anti-harassment policy that was referenced in its employee code of conduct handbook.  Wimbush argues that Kaiser failed to disseminate the policy, but during her February 2010 performance review, before Veney's alleged harassment, she acknowledged having reviewed the handbook.  The fact that Kaiser had such a policy "militates strongly in favor of a conclusion that the employer exercised reasonable care to prevent and promptly correct sexual harassment." *Brown v. Perry*, 184 F.3d 388, 396 (4th Cir. 1999).

Kaiser must still show that it administered its anti-harassment policy in good faith and that the policy was not dysfunctional. *Id.* According to Wimbush, Kaiser failed to enforce its sexual harassment policy at the Fair Oaks Call Center and failed to take appropriate action in response to her complaint. Wimbush offers no specific evidence to support her claim that sexual harassment was rampant at Fair Oaks, or that Veney had treated female employees in a sexually inappropriate manner on prior occasions. Before Wimbush's complaint, Kaiser had received six complaints about Veney from employees, both male and female, most relating to verbal abuse or speaking in a disrespectful manner, but none referenced sexual harassment.

But the existence of Kaiser's sexual harassment policy does not warrant summary judgment because Kaiser has not shown definitively that it exercised reasonable care to promptly correct the sexual harassment experienced by Wimbush. There is no dispute that Kaiser was made aware of the complaint, at the latest through Gibson's and Kazadi's complaints in August. Wimbush asserts that once Kaiser was put on notice, it failed to respond adequately because Rigo twice refused, on August 30 and September 8, to remove Veney as her supervisor, even though Wimbush expressed and explained her fear of him. She also insists that Kaiser took no steps to reduce her contact with Veney. Even after she came back from medical leave on October 11, Wimbush believed that Veney remained her supervisor and continued to attempt to intimidate her, which caused her to go back out on leave on October 15. Kaiser acknowledges that Rigo refused to remove Veney as Wimbush's supervisor on September 8, but claims that she offered to implement measures to ensure that Wimbush did not have one-on-one interactions with Veney. Kaiser also asserts that Veney was temporarily removed as Wimbush's supervisor while her complaint was investigated from September 8 until November 9, 2010, by which time Wimbush had stopped working at the Call Center.

These conflicting accounts reveal that the parties have a genuine dispute of material fact on whether Kaiser refused a request on August 30 to remove Veney as Wimbush's supervisor, whether upon refusing such removal on September 8, Kaiser offered accommodations to minimize contact between Veney and Wimbush, and whether Veney was ever removed as a supervisor during the compliance investigation.  These disputes necessitate denial of summary judgment because a reasonable jury could conclude that Kaiser's refusal to take action after two requests by Wimbush not to be supervised by Veney anymore did not constitute a reasonable response.

Even under Kaiser's version of events, a reasonable jury could find that Kaiser did not exercise reasonable care when Rigo, having heard of Veney's sexual harassment from Wimbush, Gibson, and Kazadi, refused to remove Wimbush from Veney's supervision and instead offered a variety of workarounds.  Such an argument is supported by the fact that Wimbush ended up on medical or unpaid leave for several weeks after this arrangement was discussed.  Then when she returned on October 11, regardless of who Wimbush's supervisor was at that point, Kaiser has not shown that it did anything to prevent Veney from continuing to have access to Wimbush, and has offered no evidence to refute her assertion that he then sought to intimidate her and caused her to go out on leave again on October 16 and never return.  A reasonable jury could also consider the results of Kaiser's investigation, which recommended no action other than that Veney receive sexual harassment training, and Kaiser's failure then to ensure that Veney received such training, to exhibit a lack of reasonable care by Kaiser.

Because a reasonable juror, viewing all the evidence, could conclude that Kaiser did not exercise reasonable care to correct promptly Veney's harassment, Kaiser's affirmative defense fails at the summary judgment stage.  The Court therefore need not address the second prong,

whether Wimbush failed to take advantage of preventive or corrective opportunities provided by Kaiser.  Thus, Kaiser is not entitled to summary judgment on Wimbush's claim of a sex-based hostile work environment at the Fair Oaks Call Center.

### B.     Hostile Work Environment at Gaithersburg

Wimbush also claims that Butler subjected her to a racially hostile work environment at the Gaithersburg Medical Center by ignoring and denying Wimbush's requests for leave, pairing up white receptionists but not black receptionists, refusing to meet with her about workplace issues, attempting to change Wimbush's shift, blocking her promotion by speaking to Reinhardt about her use of FMLA leave, and preventing Wimbush from performing union duties.

There is a legitimate question whether Wimbush can establish that this conduct was directed at Wimbush because of her race.  Wimbush testified that Butler treated her "pretty much as a respectful employee" and that she "never had any problems" before she became a shop steward, Wimbush Dep. at 250-51, indicating that some or all of the perceived unfairness may have been based on her union status rather than race.  *See Gilliam v. S.C. Dep't of Juvenile Justice*, 474 F.3d 134, 142-43 (4th Cir. 2007) (rejecting a racially hostile work environment claim based on alleged disparate treatment of white nurses and black nurses where there was no evidence of racial animosity by the supervisor).

But even if Wimbush could show that race motivated some of the conduct, Wimbush has not shown that Butler's conduct was sufficiently severe or pervasive as to establish a hostile work environment.  A racially hostile work environment is one that is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment."  *Boyer-Liberto*, 786 F.3d at 277.  Among the relevant considerations are whether there was any "physically

threatening or humiliating" race-based conduct in the workplace. *Id.* Here, Wimbush has offered no evidence of intimidation, ridicule, or insults, or any "physically threatening or humiliating" conduct. Butler did not use racial epithets or racially derogatory language toward Wimbush. *See id.* at 277-78 (finding that a single incident involving an "extremely serious" racial epithet could establish a racially hostile work environment). There is no evidence that Butler said or did anything that overtly ridiculed or insulted Wimbush. The alleged conduct at issue—providing more favorable shifts and working conditions to non-African American receptionists, not granting leave requests, and providing an unfavorable job reference—might relate to a claim of disparate treatment based on race, but lacks this necessary component of intimidation, ridicule, or insult to support a hostile work environment claim. *See id.* at 277. The Court therefore grants summary judgment to Kaiser on the claim of a racially hostile work environment at the Gaithersburg Medical Center.

## IV.    Retaliation Claims

Wimbush claims that Kaiser employees at both Fair Oaks and Gaithersburg retaliated against her for opposing discrimination. Title VII prohibits retaliation against an employee because the employee has "opposed" an "unlawful employment practice." 42 U.S.C. § 2000e-3(a). To establish a *prima facie* case of retaliation under Title VII, the plaintiff must prove that (1) the plaintiff engaged in a protected activity; (2) the employer took an adverse employment action against the plaintiff; and (3) there was a causal connection between the two events. *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015). The burden then shifts to the employer to identify a legitimate, non-retaliatory reason for taking the adverse employment action. *Id.* If the employer does so, "the burden shifts back to the plaintiff to rebut the employer's evidence by demonstrating that the employer's purported non-retaliatory reasons

were not its true reasons, but were a pretext for discrimination." *Id.* (internal quotation marks omitted). "If a plaintiff can show that she was fired under suspicious circumstances and that her employer lied about its reasons for firing her, the factfinder may infer that the employer's undisclosed retaliatory animus was the actual cause of her termination." *Id.*

### A.   Retaliation at Fair Oaks

Wimbush alleges that she endured retaliation for her complaints of sexual harassment when Veney and Kaiser management filed false corrective actions against her. According to the Collective Bargaining Agreement between Kaiser and Local 2, there are five levels of corrective action. The first two levels are "problem-solving levels." Wimbush Dep. Ex. 26, Collective Bargaining Agreement at 10. Corrective actions only become disciplinary at the third level, at which point the corrective action goes into the employee's personnel file. Wimbush has not presented any evidence as to the level of the alleged corrective actions or shown that these actions constituted discipline. In fact, she acknowledged during her deposition that she had not suffered any adverse consequences from these corrective actions. Thus, Wimbush has not satisfied the element of being subject to an adverse employment action, defined as one which "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-68 (2006) (internal quotation marks omitted); *see Adams v. Anne Arundel Cty. Pub. Schs.*, 789 F.3d 422, 429 (4th Cir. 2015) (holding that a reprimand letter that did not adversely affect the plaintiff's employment position, pay, or benefits did not constitute an adverse employment action). To the extent Wimbush alleges that Veney's snarling, eye rolling, and paper throwing constituted actionable retaliation, this behavior also fails to meet this standard. *See Burlington Northern*, 548 U.S. at 69 (stating that "petty slights," such as refusing to invite an employee to lunch, are

not adverse employment actions); *Adams*, 789 F.3d at 429 (finding that employer's verbal reprimands without further consequences did not constitute an adverse employment action). Wimbush's claim of retaliation for reporting sexual harassment at Fair Oaks thus fails as a matter of law.

### B.      Retaliation at Gaithersburg

Wimbush claims that Kaiser terminated her employment as a receptionist at the Gaithersburg Medical Center because she helped co-worker Jessica Station oppose racial discrimination by their supervisor Katherine Butler.[3]  Kaiser contends that Wimbush did not engage in a protected activity, that, even if she did, there was no causal link between her protected activity and her termination, and that Kaiser fired her for a legitimate, non-retaliatory reason.

### 1.      Protected Activity

Title VII provides a remedy to employees who are retaliated against for opposing unlawful employment practices.  42 U.S.C. § 20003e-3(a).  Courts take an "expansive view of what constitutes oppositional conduct."  *DeMasters v. Carilion Clinic*, 796 F.3d 409, 417 (4th Cir. 2015).  It "encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities."  *Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998). The plaintiff's actions are assessed in their totality, rather than as individual, discrete acts, to determine whether the plaintiff has opposed unlawful discrimination.  *DeMasters*, 796 F.3d at 418.  To qualify as protected activity, the employment practices opposed may be either "actually

---

[3]   At the February 19, 2016 hearing on the Motion, Wimbush's counsel clarified that Wimbush is not pursuing a theory that Kaiser terminated her because of her race.

unlawful under Title VII" or reasonably believed by the employee to be unlawful.  *Boyer-Liberto*, 786 F.3d at 282.

Here, Station reported to Wimbush that she believed that Butler was discriminating against her on the basis of race.  In particular, Station referenced Butler's practice, which Wimbush also perceived, of pairing up white receptionists more frequently than black receptionists with the result that the African American receptionists had significantly more work.  Station also noted that a white receptionist always seemed to report her when she left her desk, even for a brief period of time.  Furthermore, she had concerns about Butler's attitude toward her during the discussion about her odor, including Butler's conclusion that Station needed to undergo a "transformation."  Wimbush's own experiences reinforced the information reported by Station.  Wimbush observed what she believed to be Butler's disparate treatment of African American receptionists by requiring them to work alone, and Butler had called Wimbush inexplicably to ask why Station was not at her desk.  Regardless of whether Butler's actions were unlawful, Wimbush had a reasonable belief in the validity of Station's claim.

According to Wimbush, she took measures to bring this problem to Kaiser's attention.  First, she met with Butler and Station to discuss why Station felt that Butler was treating her unfairly and in a racist manner.  She tried to set up another meeting with Butler to address issues unresolved in the first meeting, but Butler rebuffed that effort.  Wimbush then contacted Sandy Smith, head shop steward for Local 2.  Wimbush specifically told Smith about Station's continuing concerns, including her allegation of race discrimination.  Wimbush also contacted Mike Cowan, a Local 2 union officer, and Jackie Sayan of Kaiser's Human Resources Department to report the same issues.

Wimbush informing Butler, a supervisor, of Station's concerns about race discrimination, would constitute protected activity.  Moreover, if Wimbush notified Smith or Cowan of Station's belief that Butler had treated white receptionists more favorably than black receptionists, she would also have engaged in a protected activity because reporting discrimination to a union official is sufficient to constitute opposing discrimination.  *See* 2 EEOC Compliance Manual § 8–II(B)(2) (1998) ("A complaint or protest about alleged employment discrimination to a . . . union official . . . constitutes opposition.");[4] *Rhodes v. Napolitano*, 656 F. Supp. 2d 174, 184-85 & n.9 (D.D.C. 2009) (holding that an employee's complaints of race discrimination to her union constituted protected activity).  Although Smith professes that Wimbush never talked to her about race discrimination against Station, given Wimbush's testimony to the contrary, that is a question for the jury to decide.  Consideration of the totality of Wimbush's activities, which included accompanying Station to her first meeting with Butler to raise concerns about race discrimination, seeking to set up a second meeting to discuss race discrimination and other complaints, and reporting Station's complaints of mistreatment to Sayan, bolsters the claim that she engaged in protected activity.  *See DeMasters*, 796 F.3d at 418.

Kaiser argues that Wimbush did not engage in protected activity because, at most, she merely "ferried" Station's complaint to others.  To the contrary, assisting a co-worker to communicate allegations of race discrimination to those who might be able to stop it constitutes protected activity.  *See DeMasters*, 796 F.3d at 418-20 (holding that an employee assistance program consultant who helped an employee report a sexual harassment complaint engaged in protected activity).  Kaiser also asked the Court to apply the "manager rule," a doctrine under the

---

[4]   EEOC compliance manuals "reflect 'a body of experience and informed judgment to which courts and litigants may properly resort for guidance.'" *Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 399 (2008) (quoting *Bragdon v. Abbott*, 524 U.S. 624, 642 (1998)).

Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.* (2012), which provides that a manager has not engaged in protected activity for purposes of asserting an FLSA retaliation claim by reporting complaints during the course of the manager's regular duties. *See DeMasters*, 796 F.3d at 421 (describing the "manager rule"). Kaiser argues that under the "manager rule," Wimbush's efforts on behalf of Station were not protected activity because they fell within Wimbush's role as shop steward. The Fourth Circuit, however, categorically rejected the application of the "manager rule" to Title VII cases in *DeMasters*, a decision published three days before Kaiser submitted its Reply Memorandum. *Id.* at 422-24. Thus, Wimbush has offered sufficient evidence that she engaged in a protected activity.

### 2. Causation

Wimbush must also demonstrate a causal link between her protected activity and her termination. Although Butler accused Wimbush of calling her a racist, and Adams, after investigating, concluded the accusation was true, it was Campbell who decided to fire Wimbush. Thus, it is Campbell's motivations that are relevant to the causation inquiry. *See Holland v. Washington Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007) (stating that for retaliatory discharge claims, it is "the perception of the decisionmaker which is relevant, not the self-assessment of the plaintiff") (quoting *Beall v. Abbott Labs.*, 130 F.3d 614, 620 (4th Cir. 1997))).

To establish causation, Wimbush needs to show that Campbell was aware of her protected activity. *Holland*, 487 F.3d at 218. Kaiser argues that Campbell's knowledge of the situation was limited to what he read in the Adams Report, which he claims did not describe any protected activity engaged in by Wimbush. The Adams Report, however, indicates that Station complained to her shop steward, Wimbush, about race discrimination by Butler. It also relates Wimbush's assertion that employees came to her in her role as shop steward "to express

concerns regarding racism," and that Wimbush "conveyed the concerns to Head Shop Steward, Sandy Smith."  Campbell Decl. Ex. 1, Adams Report at 5.  The fact that Wimbush refused to identify the specific employees because she believed she owed them a duty of confidentiality as their shop steward indicates that the communications to and by Wimbush were in the context of reporting discrimination to union officials.  Wimbush also told the investigator that she believed that she was being retaliated against, and that the investigation came about "because she advised someone to contact Compliance."  *Id.*

Thus, from the report, Campbell learned that Wimbush had stated that she assisted co-workers in opposing race discrimination by reporting such claims through the union structure and could reasonably infer that one of those co-workers was Station.  Although the report contains conflicting information, such as Smith's denial that she received complaints about discrimination, Wimbush has nevertheless presented evidence sufficient to create a genuine issue of material fact whether Campbell fired her after learning of her protected activity, as required to meet the causation element of a *prima facie* case of retaliation.  *See Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989).

### 3.      Non-Retaliatory Reason and Pretext

Because Wimbush has presented sufficient evidence to establish a *prima facie* case of retaliation, the burden shifts to Kaiser to show a legitimate, non-retaliatory reason for the termination.  Campbell claims that he fired Wimbush because, based on the Adams Report, he believed that she had spread a false and malicious rumor that Butler was a racist.  Wimbush does not have direct evidence that Campbell harbored retaliatory motives, but can establish pretext by showing "that she was fired under suspicious circumstances and that her employer lied about its reasons for firing her."  *Foster*, 787 F.3d at 250.

There is a serious question whether Kaiser's proffered reason is truly non-retaliatory, particularly where the investigation leading to the termination was initiated by Butler, and Wimbush has asserted that before the investigation she had discussed with Butler Station's concerns about racism and unfair treatment. There is a fine line between firing someone for calling a supervisor a racist, which is the proffered reason for Wimbush's termination, and firing someone for complaining that a supervisor has engaged in race discrimination, which is the essence of unlawful retaliation. Other than the semantic difference between complaining about a supervisor being "racist" rather than "racially discriminatory," the difference appears to come down to whether the employee honestly believed that the employer had acted in a racist or racially discriminatory manner, and whether the employee raised the concern to the legally appropriate official within the company. It would be extremely difficult to conclude that a decision to terminate an employee for referring to a supervisor as a "racist" is completely non-retaliatory if there is any indication that the employee believed that the supervisor had engaged in discrimination.

Even assuming that Kaiser's proffered reason is non-retaliatory, the Adams Report itself provides sufficient evidence for a reasonable jury to conclude that Campbell's reason for terminating Wimbush was false and a pretext for retaliation. According to Campbell, the Adams Report convinced him that Wimbush had spread a false and malicious rumor. But the report identifies only one person, Benjamin, who definitively remembered Wimbush calling Butler a racist. More importantly, the report contained ample evidence to support the conclusion that to the extent that Wimbush and Station referred to Butler as a racist, it was not to spread false rumors, but because they actually believed that Butler had engaged in racially discriminatory conduct against African American employees. Wimbush told the investigator that employees

had come to her to express concerns about racism, that she had reported those concerns to the union through Smith, and that she had advised one employee to contact Compliance. Wimbush also complained to the investigator that "nothing is said to Caucasian females" about "issues," indicating that Wimbush may well have believed that African American employees were unfairly singled out for criticism.[5]   Campbell Decl. Ex. 1, Adams Report at 6.   Likewise, Station told the investigator that Butler discriminates by being stricter with African American employees regarding the attendance policy than with other employees, and that she is condescending and had made offensive gestures.   Station also reported that Donaldson had told her that Butler shows favoritism to white people and is racist.   Although Donaldson denied make any statements about Butler, he confirmed that he had heard from one or more of Wimbush, Station, Benjamin, and Myles that Butler "shows favoritism toward white employees and is demeaning and condescending toward African American employees." *Id.* at 3.   Taken together, these statements in the Adams Report support the conclusion that Wimbush, Station, and perhaps others actually believed that Butler had treated African American employees in a discriminatory manner, such that any reference to her as racist would have been for purposes of determining whether others shared the same experience, not for the purpose of spreading rumors that they knew to be false.

The report ignored this evidence and simplistically concluded, without further examining the claims of favoritism toward white employees and condescension toward black employees, that because certain other African American employees did not share this perception of race

---

[5]   Although when asked directly, Wimbush said that she did not believe Butler was racist toward her, the investigation created a Catch-22 that put her in an untenable position.   If Wimbush told the investigator that Butler had acted in a racist manner towards her, even if honestly felt, that admission would likely be used against her to show that she must have used the term "racist" at some point, and discipline would result.   On the other hand, if she denied believing that Butler had acted in a racist manner, it would be used against her—as it apparently was—to show that any such statement was false and malicious.   Not surprisingly, during the interview Wimbush expressed reluctance to provide details because she feared losing her job.

discrimination by Butler, Wimbush and Station could not have had any legitimate basis to think she was racist or discriminatory.  A reasonable jury, however, could conclude that Campbell, after reviewing the full report, did not actually believe that these employees who expressed concerns about race discrimination to the investigator were deliberately spreading false rumors about Butler, but instead chose to use the report as a pretext to fire Wimbush because she had sought to advance allegations of race discrimination through the union process.[6]  Kaiser has thus failed to show that there is no genuine dispute of material fact regarding Wimbush's retaliatory discharge claim.

## V.    FMLA

The FMLA guarantees 12 weeks of leave per year to employees caring for a spouse, child, or parent suffering from a "serious health condition."  29 U.S.C. § 2612(a)(1)(C).  An employer can violate the FMLA both by interfering with an employee's attempt to exercise FMLA rights and by retaliating against an employee who exercises those rights.  *Yashenko v. Harrah's NC Casino Co.*, 446 F.3d 541, 546 (4th Cir. 2006).  Wimbush asserts both types of claims in this action.

### A.    Interference

Wimbush claims that Kaiser violated the FMLA when Butler denied her FMLA leave to care for her sick son.  The FMLA states that it "shall be unlawful for any employer to interfere with, restrain, or deny the exercise" of FMLA rights.  29 U.S.C. § 2615(a)(1).  To establish a claim for FMLA interference, Wimbush must prove that (1) she was entitled to FMLA leave; (2)

---

[6]   Campbell also had reason to believe that Butler, who had requested the investigation, might hold a grudge against Wimbush.  About two months before Butler accused Station and Wimbush of rumor-mongering, on June 5, 2013, Campbell received a union grievance asserting that Butler's plan to reassign Wimbush's shift violated the Collective Bargaining Agreement.  That grievance blocked Butler's proposed shift change.

Kaiser denied her the leave; and (3) the denial caused harm.  *See Adams v. Anne Arundel Cty. Pub. Schs.*, 789 F.3d 422, 427 (4th Cir. 2015).

Wimbush's claim fails because she has not presented evidence that the requested leave to care for her son was covered by the FMLA.  FMLA leave to care for a spouse, child, or parent is available only if the family member has a "serious health condition," defined as "an illness, injury, impairment, or physical or mental condition" that involves either "inpatient care in a hospital, hospice, or residential medical care facility" or "continuing treatment by a health care provider."  29 U.S.C. § 2611(11).  United States Department of Labor regulations interpreting the FMLA, to which courts afford deference, *see Rhoads v. FDIC*, 257 F.3d 373, 382 n.7 (4th Cir. 2001), define "continuing treatment by a health care provider" to include, among other things, treatment by a health care provider following a "period of incapacity of more than three consecutive, full calendar days" or for conditions that might result in such incapacity absent treatment; treatment for "incapacity due to a chronic serious health condition"; "[r]estorative surgery after an accident or other injury"; and "permanent or long-term conditions."  29 C.F.R. § 825.115.

Wimbush claims that she was denied FMLA leave to care for her sick son, but she did not present evidence, either to Kaiser at the time or to the Court on this Motion, about the nature or severity of her son's condition.  Since there is no evidence that he received "inpatient care" or "continuing treatment by a health care provider," a reasonable juror could not conclude that Wimbush's son suffered from a "serious health condition."  29 U.S.C. §§ 2611(11), 2615(a)(1). Because Wimbush has not met her burden of production on an element of her FMLA interference claim, the Court will grant summary judgment to Kaiser on this claim.

### B.      FMLA Retaliation

Wimbush also claims that Kaiser unlawfully retaliated against her when Reinhardt decided not to hire her as a physical therapy aide upon learning from Butler that she had frequently used FMLA leave.   The FMLA's provision stating that it is unlawful for "any employer to discharge or in any manner discriminate against any individual" for opposing FMLA violations, 29 U.S.C. § 2615(a)(2), has been interpreted to bar retaliation against an employee for exercising FMLA rights.  *Yashenko*, 446 F.3d at 546.

FMLA retaliation claims proceed under the same burden-shifting framework as Title VII retaliation claims.  *Id.* at 550-51.  Consequently, Wimbush must first show that she engaged in protected activity, that Kaiser took an adverse employment action against her, and that the protected activity and adverse action are causally linked.  *Id.* at 551.  Wimbush engaged in a protected activity by taking FMLA leave, and Reinhardt took an adverse employment action against her by declining to hire her for the physical therapy aide position.  Because Reinhardt learned from Butler of Wimbush's use of FMLA leave a short time before rejecting her application, Wimbush has also established causation for purposes of a *prima facie* case.  *See id.*

With the burden to present a legitimate, non-retaliatory reason for not hiring Wimbush, Kaiser asserts that it selected another candidate who more qualified.  That candidate, then a part-time receptionist at the Gaithersburg Medical Center, had worked as a physical therapy aide from 2003 to 2005.  According to Reinhardt, Wimbush lacked experience in a relevant clinical setting.

In response to this asserted non-retaliatory reason, Wimbush must show that the stated reason was false and a pretext for retaliation.  In support of her contention that she was not selected because she had exercised her FMLA rights, Wimbush testified in her deposition that Reinhardt told her during their interview that she wanted to hire her and just needed to speak

with Wimbush's supervisor first.  She also told Wimbush to check with Human Resources to confirm the salary.  According to Butler, when they met, Reinhardt asked her about Wimbush's time and attendance.  According to Wimbush, Butler later acknowledged that she told Reinhardt that Wimbush used FMLA leave "a lot."  Wimbush emailed Reinhardt on November 23 to thank her for the interview and tell her that she checked with Human Resources and found the salary to be acceptable.  Then, a few days later, Reinhardt informed Wimbush that she had hired someone else with more experience.  Notably, because Reinhardt interviewed the selected candidate before Wimbush, she was already aware of the two candidates' qualifications at the time she allegedly told Wimbush she wanted to hire her, so the selected candidate's allegedly superior experience would not explain Reinhardt's reversal.

In disputing Wimbush's account, Butler asserts that she volunteered that Wimbush had used FMLA leave to ease Reinhardt's concerns about Wimbush's attendance record, which might otherwise suggest that Wimbush took leave without notice or justification, and that she actually encouraged Reinhardt to hire Wimbush.  Furthermore, Reinhardt denied harboring or expressing any enthusiasm for Wimbush's candidacy and asserted that she informed Human Resources of her decision to select the other candidate the same afternoon she spoke with Wimbush.

When viewed in the light most favorable to Wimbush, however, Kaiser's version is not airtight.  Reinhardt does not explain why, if she had already told Human Resources that she had selected the other candidate, she still spoke to Butler about Wimbush after the interview.  Reinhardt admitted that she considered Wimbush's FMLA "because it would affect her time and attendance," Opp'n, Reinhardt Dep. at 62, but claims that it did not influence her decision.  Futhermore, Wimbush's post-interview email corroborates her account, in that she wrote that

Reinhardt had instructed her to check with Human Resources to confirm that the salary for the position was acceptable.  This instruction suggests that Reinhardt believed Wimbush to be a viable, or even the leading, candidate, rather than that she had already selected the other candidate and was interviewing Wimbush solely to comply with union rules.  Finally, Wimbush notes that the selected candidate's application had weaknesses, including that her supervisor at Kaiser told Reinhardt that she struggled with customer service, one of the duties of a physical therapy aide, and was a disappointing hire.

Thus, there is a genuine issue of material fact on whether Reinhardt declined to hire Wimbush because of her use of FMLA leave.  Because a reasonable jury could conclude that Reinhardt planned to hire Wimbush but changed her mind because she learned that Wimbush frequently used FMLA leave, the Court denies summary judgment on Wimbush's FMLA retaliation claim.

## VI.    Preemption of the FEPA

Wimbush claims that Kaiser violated the Maryland FEPA by discriminating against her based on her race and sex.  The FEPA is the state-law analog to Title VII, and courts look to cases decided under Title VII for guidance in its application.  *Arsham v. Mayor & City Council of Balt.*, 85 F. Supp. 3d 841, 849 (D. Md. 2015).  When the same claim is pleaded under both Title VII and the FEPA, the outcome will generally be the same.  *See id.*  Thus, because the Court grants summary judgment on Wimbush's Title VII claims regarding retaliation at Fair Oaks and hostile work environment at Gaithersburg, it also grants summary judgment on Wimbush's parallel claims under the FEPA.  Because summary judgment is denied on Wimbush's Title VII claims regarding hostile work environment at Fair Oaks and retaliatory discharge from Gaithersburg, her equivalent FEPA claims also remain.

Kaiser asserts that Wimbush's FEPA retaliatory discharge claim is preempted by the National Labor Relations Act ("NLRA"), 29 U.S.C. §§ 151-169 (2012).   Under *San Diego Building Trades Council v. Garmon*, 359 U.S. 236 (1959), the NLRA preempts state law regulating activities that are actually or arguably protected under NLRA § 7, which generally guarantees employees the right to organize, collectively bargain, and engage in other concerted activities, 29 U.S.C. § 157, or that are actually or arguably prohibited under NLRA § 8, which bars employers' interference with those rights, *id.* § 158.  *Garmon*, 359 U.S. at 244-45.  Through the NLRA, Congress vested the National Labor Relations Board ("NLRB") with primary authority to interpret and enforce federal labor law.  *Richardson v. Kruchko & Fries*, 966 F.2d 153, 155 (4th Cir. 1992).  *Garmon* preemption ensures that state law, whether applied by state or federal courts, does not encroach on the jurisdiction reserved for the NLRB.  *Id.* at 155-56.

A state law of general applicability regulating conduct arguably prohibited by NLRA § 8 may not be preempted, however, if it "touche[s] interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction," courts cannot infer that Congress has "deprived the States of the power to act."  *Garmon,* 359 U.S. at 244.  Such a law is preempted only if the controversy presented to the state court is identical to . . . that which could have been, but was not, presented to the Labor Board."  *Sears, Roebuck & Co. v. San Diego Cty. Dist. Council of Carpenters*, 436 U.S. 180, 197 (1978).  If a state lawsuit presents a different legal issue than that which would have been taken up by the NLRB, it does not create a "risk of interference with the unfair labor practice jurisdiction of the Board which the arguably prohibited branch of the *Garmon* doctrine was designed to avoid."  *Id.*

The conduct at issue in Wimbush's FEPA claim for retaliatory discharge is Kaiser's decision to fire her.   The Supreme Court has held that the NLRA and Title VII provide

concurrent remedies, *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 47-48 (1974), and Congress enacted Title VII to supplement and not supplant state-law anti-discrimination remedies, 42 U.S.C. § 2000e-5(c); *N.Y. Gaslight Club, Inc. v. Carey*, 447 U.S. 54, 63-65 (1980). Thus, there is no inherent conflict arising from a union member pursuing a retaliation claim under state law based on opposing race discrimination. But Wimbush's conduct was arguably prohibited by NLRA § 8 because her termination could have been based in part on her performance of her duties as a union shop steward. *See FPC Holdings, Inc. v. NLRB*, 64 F.3d 935, 942 (4th Cir. 1995) (stating that an employer violates NLRA § 8(a)(3) when its decision to fire an employee was motivated by anti-union animus). In fact, Local 2 filed a charge with the NLRB alleging anti-union animus as the motivation for Wimbush's termination. The charge was withdrawn before the NLRB ruled on the merits of the case.

Nevertheless, Wimbush's FEPA claim may still escape preemption if it implicates a "deeply rooted local interest" and presents a different controversy than that which could have been presented to the NLRB. The FEPA, and state anti-discrimination statutes generally, reflect a "deeply rooted local interest" in protecting employees who oppose race discrimination from retaliation. *See* Md. Code Ann., State Gov't § 20-602 (2015) (declaring that it is the policy of the State of Maryland "to assure all persons equal opportunity in receiving employment" and "to prohibit discrimination in employment by any person"). *Cf. Chaulk Servs., Inc. v. Mass. Comm'n Against Discrimination*, 70 F.3d 1361, 1365 (1st Cir. 1995) (assuming that a state has a significant interest in protecting its citizens from sex discrimination in the workplace). Significantly, in enacting Title VII, Congress not only explicitly preserved state-law anti-discrimination remedies such as the FEPA, it required that the federal government initially defer to those state remedies. *See* 42 U.S.C. § 2000e-5(c) (where a state-law anti-discrimination claim

has been filed, the federal government may not file a claim until 60 days after the initiation of the state claim).

Kaiser argues that the local interest exception does not apply because Wimbush's lawsuit involves the same conduct, and therefore, the same controversy, as the union's NLRB charge. The FEPA claim and the NLRB charge do involve a common factual question:  why did Kaiser fire Wimbush?  But the Supreme Court in *Sears* made clear that the same facts can give rise to multiple controversies, some subject to the NLRB's jurisdiction and some not.  436 U.S. at 196-97.  Such is the case here.  The union's NLRA charge would have required the NLRB to decide if Wimbush engaged in union activity protected under the NLRA and whether Kaiser fired her because of that activity.  *See FPC Holdings, Inc.*, 64 F.3d at 942.  By contrast, Wimbush's FEPA claim calls upon this Court to determine if Wimbush engaged in activity protected by the FEPA—specifically, opposing race discrimination—and whether Kaiser fired her because of that activity.  Deciding whether Wimbush was fired for opposing race discrimination in violation of the FEPA does not involve the interpretation of labor law, so allowing a court to resolve this issue does not imperil the uniformity of that body of law.  *Cf. Richardson*, 966 F.2d at 157-58 (holding that state tort law claims were preempted because they hinged upon proof that the NLRA had been violated).  Wimbush has not asserted, nor will the Court entertain in this action, an argument that she was discharged because she engaged in protected union activity.

Wimbush's FEPA claim for retaliatory discharge is therefore not preempted.

**CONCLUSION**

For the foregoing reasons, Kaiser's Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART.  The Motion is GRANTED as to Wimbush's Title VII and FEPA claims of retaliation at Fair Oaks and hostile work environment based on race at Gaithersburg, and as to her claim of FMLA interference.  The Motion is DENIED as to Wimbush's Title VII and FEPA claims for a hostile work environment based on sex at Fair Oaks and retaliatory discharge at Gaithersburg, and as to her claim of FMLA retaliation.  A separate Order shall issue.


Date:  February 29, 2016                              _____/s/_____
                                                      THEODORE D. CHUANG
                                                      United States District Judge